STATE of Minnesota, Respondent,

v.

Theodore Stevie VARNER, Petitioner, Appellant.

No. C4–00–801.

Supreme Court of Minnesota.

May 9, 2002.

John M. Stuart, State Public Defender, Susan K. Maki, Assistant State Public Defender, Minneapolis, MN, for Appellant.

Mike Hatch, Attorney General, Susan Gaertner, Ramsey County Attorney, Mark Nathan Lystig, Assistant County Attorney, St. Paul, MN, for Respondent.

## OPINION

PAGE, Justice.

On August 2, 1999, Theodore Varner was charged by complaint in Ramsey County District Court with one count of possession of a firearm by an ineligible person. Additional charges were added by amended complaint, including promotion of prostitution, false imprisonment, controlled substance crime in the third degree, two counts of criminal sexual conduct in the first degree, two counts of assault in the second degree, and two counts of kidnapping. Varner pleaded not guilty and stipulated that he was not eligible to possess a firearm. On January 22, 2000, a Ramsey County jury found Varner guilty of two of the charges—possession of a firearm by an ineligible person in violation of Minn.Stat. § 624.713, subd. 1(b) (2000), and controlled substance crime in the third degree in violation of Minn.Stat. § 152.023, subd. 1(1) (2000). The jury acquitted him of all the other charges.

In this appeal, Varner raises three issues: (1) whether the trial court abused its discretion when it denied him a hearing under Minn. R.Crim. P. 26.03, subd. 9, after a juror was overheard making a racially derogatory comment to other jurors and after that same juror acknowledged commenting to other jurors that he was concerned for his safety;[1] (2) whether the act of trading cocaine for sex constitutes a sale within the meanings of Minn.Stat. § 152.01, subd. 15a, and *State v. Carithers,* 490 N.W.2d 620 (Minn.1992); and (3) whether the evidence adduced at trial was sufficient to sustain his conviction for being an ineligible person in possession of a

firearm. We reverse and remand to the district court for a new trial.

The relevant facts from the record are as follows. Tonya Stelzer and Zachurus Turner were the primary witnesses against and alleged victims of Varner. Their testimony reveals that, on May 8, 1999, Stelzer and Turner traveled from Rochester, Minnesota, to St. Paul's Frogtown area with plans to obtain crack cocaine in exchange for sex with Stelzer. They encountered Varner in the area and gave him a ride in exchange for crack cocaine. The next day, they encountered Varner again. He told them that he had friends who would be willing to exchange crack cocaine for sex with Stelzer, and took them to a house located on Blair Avenue in the Frogtown area. There, Stelzer engaged in sex with one of Varner's friends in exchange for crack cocaine. At some point, Turner left the house and went outside. While outside, Turner overheard Varner and others talking inside the house. What Turner heard led him to hide the keys to his car. When Turner went back to the house, he was met at the door by Varner, who had a gun in his hand. Varner ordered Turner into the house and asked him for the keys to his car. When Turner said that he did not have the keys, Varner hit Turner in the head with the gun. Turner eventually told Varner where the keys were. Varner then forced Turner to strip naked, threatened him, and ultimately locked him in the basement. After Turner was locked in the basement, Stelzer was forced to have sex with Varner and others, but not in exchange for crack cocaine. According to Stelzer, she had sex with Varner and the others at that point because she was afraid

---

1. Before the court of appeals and this court, Varner framed the issue of juror misconduct in terms of whether the trial court abused its discretion in denying Varner's mid-trial motion for a hearing pursuant to Rule 26.03, subdivision 9. The court of appeals, however, addressed this issue in terms of whether the trial court abused its discretion in denying Varner's post-trial motion for a new trial.

of Varner after witnessing what he had done to Turner. Turner eventually was released from the basement. Two days later, Stelzer escaped from Varner and called the police. When the police arrived and searched the house on Blair Avenue, they found four or five men, a number of dogs, drug paraphernalia, and a semi-automatic pistol. Varner was not present at the time, but was arrested later.

Varner's trial began on January 18, 2000. On January 20, 2000, Varner's cousin reported that during a break in the trial he overheard one juror, "Juror M.," make a racial comment to other jurors and that the jurors listening appeared amused. Juror M. was subsequently interviewed by the trial court outside the presence of the other jurors. In response to questioning, the following exchange took place:

[Juror M.]: I believe exactly what I said was the area from Dale down Van Buren to Western at a place that I used to work at considered that place the miracle mile.

* * *

[Juror M.]: I made a reference to the fact if you were to walk down that street being a white person and if you were not either beat up or robbed, it was considered a miracle.

The Court: [Juror M.], that comment certainly by many people can be considered a racial-biased comment.

[Juror M.]: I understand that.

The Court: Do you understand that?

[Juror M.]: Yes, I do.

It is unclear from the record how many jurors were exposed to Juror M.'s "miracle mile" comment. Juror M. identified at least two jurors who he believed did hear him, although he stated that "possibly"

others also heard him. Juror M. testified that the other jurors had "no reaction [to the comment] as far as [he] could see." Juror M. also indicated that he had told other jurors that he was concerned for his safety and that other jurors expressed similar concerns. At the end of this questioning, the trial court dismissed Juror M. from further service.

Based on Juror M.'s remarks about the "miracle mile" and his discussion of safety concerns with other jurors, Varner requested that the trial court question each juror under Minn. R.Crim. P. 26.03, subd. 9, or declare a mistrial. The trial court declined to question any of the other jurors or grant a mistrial, reasoning that Juror M.'s "miracle mile" comment had not prejudiced the other jurors.[2]

Explaining his reasoning, the trial court stated:

I do not think that it is necessary to poll each of the members of the jury that may have heard this and ask them about how it's affected them. I think the comment was one that he made. It does not appear there was any response from other people. In any event, it's the type of comment that probably people have heard all of their lives at one time or another about various things. In my judgment I don't believe that it would have influenced anybody to change their minds about this case based on that comment. And I don't think it's necessary to examine each juror member with that. So I don't believe that it's poisoned the rest of the panel.

The trial court also stated:

Very simply, one of the basic grounds for me believing it does not prejudice the other jurors in this case is that the testimony basically from all the wit-

---

**2.** In explaining his reasoning for denying Varner's request, the trial court did not address

Juror M.'s discussion of safety concerns with other jurors.

nesses presented by the state at least was that this was the kind of area where a lot of high crime took place. So the location is already suspect despite what [Juror M.] may have said to the other jurors and who may have heard it. So I just don't think that that comment is going to prejudice the other jurors.

The trial court did give the following curative instruction to the jury before deliberations began:

[Y]ou must not consider feelings of prejudice, bias, including racial prejudice or sympathy, toward either the defendant or the State. You are to disregard anything you may have heard outside of this courtroom, including any comments regarding the area in question. You are to take a neutral position and decide the case on the evidence and the law.

After his conviction, Varner brought a post-trial motion for a new trial, asserting that the trial court erred by refusing to question the jurors to assess the impact of Juror M.'s remarks under Minn. R.Crim. P. 26.03, subd. 9. The trial court denied Varner's motion and stated:

And my sense of this matter was at the time that it occurred and remains, that the remark in question did not raise serious questions of possible prejudice. The remark was made at most to two to four jurors as I recall, the discussion, but it was certainly a limited number of jurors. * * * The juror in question was dismissed even though I don't believe that any actual prejudice of that juror was shown, in fact, he denied on questioning that he himself was in any way prejudice [sic]. But because of that potential, we did dismiss that juror.

On appeal, the court of appeals affirmed Varner's convictions, concluding that the trial court did not abuse its discretion by

denying Varner's motion for a new trial. The court of appeals reasoned that Juror M.'s "miracle mile" comment did not have a prejudicial effect on Varner's trial because: (1) Varner was black, as was Turner, the principal witness against him; (2) had the jurors been prejudiced by Juror M.'s comment, the jury would not have acquitted Varner of most of the charges against him; and (3) Varner's trial counsel, in his argument to the trial court, had minimized Juror M.'s comment by referring to it as a joke. The court of appeals also concluded that the act of exchanging crack cocaine for sexual favors constituted the sale of a controlled substance under Minn.Stat. § 152.01, subd. 15a, and that the jury could have reasonably concluded from the evidence adduced at trial that Varner possessed a firearm. Finally, with respect to Varner's sentence, an issue not presented in this appeal, the court of appeals reversed and remanded for resentencing.

I.

In reviewing a trial court's denial of a motion to question the jurors under Rule 26.03, subdivision 9, we consider whether the trial court properly determined that serious questions of possible prejudice were not raised.[3] *See* Minn. R.Crim. P. 26.03, subd. 9. Our review is de novo. With respect to the denial of a new trial motion, we review the trial court's decision for an abuse of discretion. *State v. Landro*, 504 N.W.2d 741, 745 (Minn. 1993), *cert. denied* 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 380 (1994).

II.

We turn first to Juror M.'s "miracle mile" comment. Rule 26.03, subdivision 9, provides that, "[i]f it is determined that

---

**3.** The prejudice to which Rule 26.03, subdivision 9, refers is legal prejudice.

material disseminated outside the trial proceedings raises serious questions of possible prejudice, the court * * * shall on motion of either party question each juror, out of the presence of the others, about the juror's exposure to that material." Because it is undisputed that Juror M.'s comment was outside the trial proceedings, and because Varner moved to have the jurors questioned about the comment under the rule, resolution of this case hinges on whether Juror M.'s "miracle mile" comment raised serious questions of possible prejudice.

 Criminal defendants have due process rights to a fair trial and an impartial jury. U.S. Const. amends. VI, XIV; Minn. Const. art. I §§ 6, 7; *State v. Bowles*, 530 N.W.2d 521, 536 (Minn.1995). "The exposure of a jury to potentially prejudicial material creates a problem of constitutional magnitude, because it deprives a defendant of the right to an impartial jury and the right to confront and cross-examine the source of the material." *State v. Cox*, 322 N.W.2d 555, 558 (Minn.1982). The law guarantees that every defendant will have his case decided strictly according to the evidence presented and not by extraneous matters or by the predilections of individual jurors. *Miller v. North Carolina*, 583 F.2d 701, 706 (4th Cir.1978).

 In cases where race should be irrelevant, racial considerations, in particular, can affect a juror's impartiality and must be removed from courtroom proceedings to the fullest extent possible. *See United States ex rel. Haynes v. McKendrick*, 481 F.2d 152, 157 (2d Cir.1973) ("[Racial prejudice] negates the criminal defendant's right to be tried on the evi-

dence in the case and not on extraneous issues."). In such cases, racial comments by jurors serve only to impugn the integrity of the fact-finding process and pose a serious threat to a fair trial. *See Weddington v. State*, 545 A.2d 607, 613 (Del. 1988) (addressing impropriety of improper racial question from prosecutor); *see generally* Randall Kennedy, *Race, Crime, and the Law* (1997); Gordon W. Allport, *The Nature of Prejudice* (25th anniversary ed., 1979) (1954). Above all, demeaning references to racial groups compromise the right to a fair trial by inviting jurors to view a defendant as coming from a different community than themselves. *See Haynes*, 481 F.2d at 160–61. As the Second Circuit aptly stated in *McFarland v. Smith*, 611 F.2d 414 (2d Cir.1979):

> To raise the issue of race is to draw the jury's attention to a characteristic that the Constitution generally commands us to ignore. Even a reference that is not derogatory may carry impermissible connotations, or may trigger prejudiced responses in the listeners that the speaker might neither have predicted nor intended.

*Id.* at 417.

 From the trial court's statements at the time it denied Varner's motion to have the jurors questioned, it appears that the trial court was not focused on whether Juror M.'s comment raised serious questions of possible prejudice, but rather on whether jurors other than Juror M. were actually prejudiced. Thus, we can only conclude that the trial court applied the wrong standard when it addressed Varner's request that the jurors be questioned under Rule 26.03, subdivision 9.[4]

---

4. To question each juror in accordance with Rule 26.03, subdivision 9, the trial court need determine only that "material disseminated outside the proceedings *raises* serious questions of possible prejudice," (emphasis add-

ed), not that there is, in fact, actual prejudice to the defendant. Even if actual prejudice had been the standard, we note that actual prejudice could not be determined without questioning the jurors.

■ We also determine whether Juror M.'s "miracle mile" comment, which was not part of the trial proceedings, raised serious questions of possible prejudice. The natural implication of the comment was that, like people in Frogtown, Varner, an African–American, is hostile and physically aggressive toward whites. Given the charges against Varner, the comment went not only to Varner's propensity to engage in the type of conduct charged, but also to Varner's propensity to engage in such conduct against a white person like Stelzer, just as alleged. Based on the race-based nature of Juror M.'s comment and the charges against Varner, we conclude that serious questions of possible prejudice were raised.

We further conclude that the trial court's reasoning does not support the conclusion that Juror M.'s comment did not result in actual prejudice, much less a conclusion that serious questions of possible prejudice were not raised. The issue of racial or ethnic bias in the courts "is not simply a matter of 'political correctness' to be brushed aside by a thick-skinned judiciary." *Powell v. Allstate Ins. Co.*, 652 So.2d 354, 358 (Fla.1995). It is an issue that must be confronted whenever improperly raised in judicial proceedings. Even statements made without a biased intent may have a negative effect when it comes to issues of race. The failure to inquire as to the impact of such statements in a criminal trial allows the prejudice, if any, to go forward.

The trial court reasoned that "it [did] not appear there was any response from other [jurors]." This statement seems to be at odds with the record, which suggests that there may have been some reaction from others present when the comment was made. During the hearing on January 20, 2000, defense counsel reported that Varner's cousin believed the other jurors present appeared amused by the comment. Absent the jurors being questioned, it is impossible to know what, if any, response the jurors may have had. Moreover, whether Juror M.'s comment is "the type of comment that probably people have heard all of their lives" is no basis for concluding that there was no actual or even possible prejudice resulting from the comment. Although racially prejudicial statements may be commonplace in society, such statements have no place among jurors, who in the administration of justice must act as impartial triers of fact and of guilt or innocence. Dismissing Juror M.'s comment because the Frogtown area was "the kind of area where a lot of high crime took place" also fails to address the racial implications of the comment and, therefore, does not support the conclusion that there was no potential or actual prejudice. Finally, we note that dismissing a racially derogatory comment about a particular neighborhood because that neighborhood has a high rate of crime improperly equates high crime with race.

The race-based nature of Juror M.'s comment invited those who heard it to see people from the Frogtown area, Varner included, as coming from a different community than themselves. Once the comment was made, serious questions of possible prejudice were raised because Varner's due process rights to a fair trial and impartial jury were implicated. Once serious questions of possible prejudice were raised, Rule 26.03, subdivision 9, required the trial court to question the jurors about their exposure to the comment.

### III.

■ We now turn to the trial court's denial of Varner's post-trial motion for a new trial. We have stated that a convicted criminal defendant seeking a new trial ordinarily bears the burden of

showing prejudicial error. *State v. Sanders*, 376 N.W.2d 196, 204 (Minn.1985). Here, it would be anomalous to require Varner to establish actual prejudice given that the trial court's erroneous denial of his request under Rule 26.03, subdivision 9, precluded him from determining what, if any, prejudice may have resulted from Juror M.'s "miracle mile" comment. Therefore, in view of the serious questions of possible prejudice raised by Juror M.'s comment and the trial court's refusal to question the jurors, as required by Rule 26.03, subdivision 9, we conclude that the trial court erred when it denied Varner's post-trial motion.

We also conclude that the court of appeals erred when it affirmed the trial court's denial of Varner's post-trial motion. In affirming, the court of appeals reasoned that Varner was not prejudiced by Juror M.'s comment because: (1) both Varner and the principal witness against him, Turner, were black;[5] (2) the jury had acquitted Varner of most of the charges against him; and (3) Varner's attorney had characterized the remark as a "joke." The court of appeals' reasoning is faulty. First,

knowledge of the fact that Varner and one of the witnesses against him, who was the alleged victim of the second-degree assault, are of the same race provides no information as to the impact Juror M.'s comment may have had on the other jurors. Moreover, the conclusion that Juror M.'s comment did not prejudice Varner because the jury found Varner guilty of two of the charges against him as opposed to all eight is, at best, pure speculation. Engaging in such speculation is improper and insufficient assurance that no prejudice, in fact, occurred.[6] Beyond speculation, there is no way of knowing whether, but for Juror M.'s comments, the jury would have acquitted Varner of all the charges. Finally, the characterization of Juror M.'s comment as a joke does not diminish its potential prejudicial impact. The court of appeals' dismissal of the comment based on this characterization wrongly assumes that racially charged "jokes" are no cause for concern. If a racially biased statement is unacceptable, a joke used as a vehicle to communicate the same message is no less unacceptable.[7]

---

**5.** Although the court of appeals pointed out that Turner, the principal witness, was black, it did not point out that Stelzer, the other victim, who also testified, was white.

**6.** One could just as easily speculate that the jury was influenced by Juror M.'s comment given that the jury found Varner not guilty of assault, but guilty of gun possession, despite the fact that the only time that Varner allegedly possessed the gun is when he allegedly used it to assault Turner and Stelzer. Facts in the record that would support a conclusion to this end are that: (1) the only connection between the gun and Varner was the assault, of which Varner was found not guilty despite Stelzer's and Turner's testimonies; (2) Varner's fingerprints were not found on the gun; (3) there was no evidence adduced at trial to suggest that the house where the gun was found belonged to Varner; (4) Varner was not present in the house at the time the police

found the gun; and (5) the police found the gun in a house with four or five other men.

The problem here, which the lower courts ignored, is that we do not know whether Juror M.'s comment influenced the jurors who heard it or whether the jurors set the comment aside. We would know, however, had the trial court not failed to question the jurors pursuant to Rule 26.03, subdivision 9. Moreover, aside from being speculative, the suggestion that the only possible manifestation of prejudice would have been a guilty verdict on each offense charged underestimates the power of prejudice and overestimates the ability of people to be unaffected by prejudice, even in its most subtle forms.

**7.** In its arguments to this court, the state takes the position that Juror M.'s comment about the "miracle mile" may have been a statement of historical fact in that his former coworkers referred to the area in that man-

Having concluded that the trial court and court of appeals erred, we find it appropriate, on these facts, to remand for a new trial. *See Bowles,* 530 N.W.2d at 536 (stating that juror misconduct may undermine the rights of a criminal defendant to a fair trial and an impartial jury, thereby warranting a new trial).

## IV.

■ For guidance on remand, we address Varner's argument that the act of trading cocaine for sex was not a sale within the meanings of Minn.Stat. § 152.01, subd. 15a, and *Carithers,* 490 N.W.2d at 622 (stating that no sale took place when husband and wife jointly acquired and constructively possessed controlled substance). Statutory construction is a question of law subject to de novo review. *State v. Murphy,* 545 N.W.2d 909, 914 (Minn.1996).

■ Varner's argument has no merit. On its face, exchanging sexual favors in return for crack cocaine fits within the definition of "sale" found in Minn.Stat. § 152.01, subd. 15a, which provides:

"Sell" means:

(1) to sell, *give away, barter, deliver, exchange, distribute* or *dispose of to another,* or to manufacture; or

(2) to offer or agree to perform an act listed in clause (1); or

(3) to possess with intent to perform an act listed in clause (1).

(Emphasis added.) Varner's conduct, if proven, would fit this definition. The facts

presented here do not fall within our narrow holding in *Carithers.* In *Carithers,* we concluded that no sale occurred when a married couple jointly acquired a controlled substance and, therefore, each had constructive possession. 490 N.W.2d at 622, 624. Here, there is no evidence that the controlled substances involved were jointly acquired or possessed by Varner and Stelzer, or that any of the parties involved were married. Therefore, on the facts presented here, the exchange of sexual favors for crack cocaine would, if proven, constitute a sale within the meaning of Minn.Stat. § 152.01, subd. 15a.

Reversed and remanded to the district court for a new trial.

---

ner. In support of this argument, the state analogized this situation to that of Jews in Nazi Germany: "It may have been a historical fact that it was dangerous for a Jewish person to walk those streets [of Germany in the 1940s], but making the comment does not mean that the person who made the comment was a Nazi." Focusing on whether the comment was a historical fact, however, misses at least two important points: (1) the comment

was outside the trial proceedings and, therefore, irrelevant to those proceedings; and (2) the comment raised issues of race that have the potential to undermine a criminal defendant's constitutional rights to a fair trial and an impartial jury and, thus, presented a consideration that "the Constitution generally commands us to ignore." *McFarland,* 611 F.2d at 417.